IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 3, 2024

**JIMMIKO DRISKELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. C1704061, 17-02484   Chris Craft, Judge**

_____

**No. W2023-00273-CCA-R3-PC**
_____

The Petitioner, Jimmiko Driskell, appeals the denial of her petition for post-conviction relief from her second degree murder conviction, arguing that she received ineffective assistance of trial counsel and was denied due process of law because she lacked the knowledge to enter a knowing, intelligent and voluntary guilty plea.  Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Terrell L. Tooten, Memphis, Tennessee (at hearing and on appeal), for the appellant, Jimmiko Driskell.

Steve Mulroy, District Attorney; Karen Cook, Assistant District Attorney; Jonathan Skrmetti, Attorney General and Reporter; and Brooke A. Huppenthal, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On May 25, 2017, the Shelby County Grand Jury returned a three-count indictment charging the Petitioner with one count of first degree premeditated murder and two counts of attempted first degree premeditated murder.  The charges arose out of the Petitioner's firing multiple gunshots with her AR-15 rifle at a group of individuals outside a Memphis

residence, resulting in the death of Alvino Johnson. On April 15, 2019, the Petitioner entered a best interest, or *Alford*, guilty plea, *see North Carolina v. Alford,* 400 U.S. 25, 91 (1970), to one count of second degree murder in exchange for a sentence of twenty years at one hundred percent in the Tennessee Department of Correction. Pursuant to the terms of her negotiated plea, the remaining two counts of the indictment were nolle prosequied. The prosecutor recited the following factual basis for the plea at the guilty plea hearing:

> Had this matter gone to trial, the State - - proof would have been that in September, between September 2nd and September 3rd of 2016, the [Petitioner] was going up and down a street here in Memphis, Shelby County looking for her mother. Her mother apparently had been beaten up by another individual and she was looking for her mother and couldn't find her. And she kept asking these people at this particular address where's my mom, where's my mom. And they said she's not here. Last time we saw her, she had gotten her butt beaten by this other individual and he's not here either. And so that went on for a little bit.

> And, ultimately, [the Petitioner] drove up to this address and started shooting in the direction of these individuals at this particular address, ultimately hitting Alvino Johnson. Alvino told all his friends I think I've been hit. Everybody scattered. Mr. Johnson's body was then found the very next morning some hours afterwards on the side of the house.

On January 2, 2020, the Petitioner filed a pro se petition for post-conviction relief in which she raised claims of ineffective assistance of counsel and unknowing and involuntary guilty plea. Among other things, she alleged that trial counsel failed to adequately explain the ballistic and medical evidence, which could have been exculpatory; made no reference to a defense strategy or preparations for trial; and "intimidated" her into pleading guilty "based on [trial] counsel's threats of a longer period of incarceration and the fact that [trial] counsel spoke only of pleading guilty."

Post-conviction counsel was appointed and a bifurcated evidentiary hearing held on February 18, 2022 and September 23, 2022. The record on appeal contains neither an amended petition nor a written notice that no amendment will be filed. *See* Tenn. Code Ann. § 40-30-107(b)(2). However, at the evidentiary hearing, post-conviction counsel primarily argued without objection that trial counsel was ineffective, and the Petitioner's guilty plea therefore unknowing and involuntary, due to trial counsel's failure to investigate or inform the Petitioner of the history of misconduct of one of the investigating officers and of discrepancies in the statements of six witnesses.

At the February 18, 2020 hearing date, trial counsel, called as a witness by the State, testified via Zoom that when she was appointed to represent the Petitioner in 2017, she was a member of the Shelby County Public Defender's Office's Capital Defense Team, which specialized in first degree murder cases. She said she received additional discovery, including the ballistics report, after she had received the full discovery packet. In each instance, she reviewed the additional discovery and provided the Petitioner with a copy. Trial counsel stated that she looked for anything that would either help or harm the Petitioner's case. She said she investigated potential factually-based and mitigation-based defenses. She had the Petitioner evaluated for mental competency and, although diagnosed with a mental health disorder, the Petitioner was found competent.

Trial counsel testified that she and her team advised the Petitioner that it would be in her best interest to pursue a plea offer, as the evidence was not in her favor. She agreed that she submitted two different plea offers to the prosecutor prior to the one that was ultimately accepted by the trial court. Included in the packet she submitted to the prosecutor was a letter from her office's mitigation investigator, Gloria Shettles, that detailed the Petitioner's background and traumatic childhood, along with doctors' reports and other mitigation evidence. She explained to the Petitioner the "back and forth" negotiation process typically involved in obtaining a plea deal and informed the Petitioner that their first offer would likely be rejected. As with any client, she immediately conveyed and discussed each new offer with the Petitioner.

Trial counsel testified that she was aware of the autopsy findings and the ballistics report at the time she and the Petitioner discussed the twenty-year offer. She said she discussed with the Petitioner the pros and cons of accepting the plea deal and "the cons outweighed the pros because the pros would have been her mitigating evidence[.]" Given all the evidence in the case, trial counsel believed it was in the Petitioner's best interest to accept the offer:

> I thought it was in her best interest to . . . try to get a plea offer from the State because I felt that if she proceeded with trial that she would be found guilty of first degree murder as well as the other charges and first degree murder carries life. And we also discussed how those other charges could have been ran . . . consecutive to the first degree murder conviction. So, we felt that it was in her best interest to enter a plea. We actually did a . . . calculation of about approximately how many years she may actually spend. And, you know, we had a discussion about how she would be younger than I was at the time when she was released because of her age. But we, you know, went through that in great detail. . . . I did that by myself as well as with members of the team as well as the mitigation investigator. She spoke with her as well.

- 3 -

Trial counsel testified that it was the Petitioner's ultimate decision to accept the plea. Although trial counsel believed it was in the Petitioner's best interest to do so, she would have taken the case to trial if the Petitioner had wanted to go that route. Trial counsel testified that trial was her favorite part of her job and the only problem she would have had with proceeding to trial was her concern for the Petitioner and her well-being. She denied that she threatened or used any "strong-handed techniques" to get the Petitioner to accept the plea, testifying that she had never "tried to strong-arm anybody into doing anything."

On cross-examination, trial counsel testified that her memory was that Dr. Avery, who performed the competency evaluation, diagnosed the Petitioner with bipolar disorder. She recalled that they had documentation that the Petitioner had been diagnosed with bipolar disorder in the past as well. When asked what the defense theory was, trial counsel responded that "there really wasn't a defense just based on the facts and . . . [the Petitioner's] statements." She stated that the Petitioner might have said she acted in self-defense, but the evidence, including the Petitioner's own statements, showed that the Petitioner was the initial and primary aggressor.

> [F]rom my understanding, she was trying to locate her aunt. I think her aunt may have called her with regards to being beaten up by her boyfriend at the time. And [the Petitioner] and one of her friends . . . kept riding by this house, asking this group of guys . . . I believe those were [the boyfriend's] friends. So, she drove around maybe two or three times asking, you know, them about where her aunt was and they said that, you know, they didn't know, she wasn't here. The last time it became a heated kind of discussion an then she drove to the end of the street, got out of her car, opened her trunk, and started firing down the street.
>
> There was some video. There was supposed to have been two video things; One from I believe a Sonic that we weren't able to get that from; and then there was some video from a store, but it just showed like the - - when the gun fires it shows the light or whatever because it was kind of like at night.
>
> But where she was standing there was several shell casings from a high-powered gun right in the area where she was shooting from. And then as she started shooting I believe the - - at least one person that she was shooting at kind of fired back, but I believe that was maybe like a 9mm or .380. It was a lower caliber weapon than what she had.

Trial counsel testified that she reviewed all the evidence in the case but did not physically examine the victim's pants because that was not something she would have done

until she was examining potential trial exhibits during trial preparation. She had no memory of seeing anything in discovery about the pants that would have suggested the victim had a self-inflicted gunshot wound. In fact, her memory was that there was no evidence that the victim ever fired a weapon.

Trial counsel testified that she read every page of discovery, and there was nothing to indicate that any of the evidence was collected incorrectly. She stated that she did not review the background and personnel files of the police officers involved in the case. She was familiar with Eric Kelly, a former Sergeant with the Memphis Police Department's ("MPD") homicide division, but there was nothing that raised any suspicion that Sergeant Kelly or any other officer had acted inappropriately, illegally or were "trying to pin this on [the Petitioner.]" Trial counsel testified that the public defender's office kept a list of police officers that had had "issues in the past[.]" Although nothing in her investigatory phase of the case aroused any suspicion of officer misconduct, had the case gone to trial, she and her team would have taken "a look" into the officers' backgrounds as part of their trial preparation phase of the case.

Trial counsel testified that she spoke with the Petitioner about the guilty plea "a couple of times[.]" The Petitioner kept the guilty plea paperwork with her to review overnight, and the following day, trial counsel reviewed the paperwork with her. In addition, the mitigation investigator visited the Petitioner to assess her mental and emotional state and to ensure that entering the guilty plea was what the Petitioner wanted to do.

Trial counsel testified that there was no evidence to support a claim of innocence. The Petitioner never told her that she was not guilty, and she had no recollection of the Petitioner's ever claiming that someone fired at her first. Instead, the Petitioner's account, corroborated by witness statements, the store surveillance video, and shell casings found at the scene, was that the Petitioner took her gun out of the trunk of her car and started shooting.

On redirect examination, trial counsel testified that she had been a defense attorney for twenty years and was on the Capital Defense Team for the last ten years of her career with the public defender's office. She estimated that she had worked on over fifty murder cases during that time. She said she met with the Petitioner many times to review the evidence and the materials she received in discovery. Based on her years of experience and her review of the evidence, she did not believe that self-defense was a viable defense theory.

Among other exhibits to the hearing, post-conviction counsel introduced the following: statements of witnesses contained in the discovery packet; a consent order in

which former MPD Sergeant Kelly agreed to never again seek employment as a police officer; and documentation from Sergeant Kelly's employment file reflecting that prior to the time of the Petitioner's case, several different complaints were made against him of various things from the mishandling of police equipment, inappropriate touching of two teenage girls, use of excessive force, and performing a warrantless search. The employment file further reflected that Sergeant Kelly resigned after being charged in June 2019 with violations of several departmental regulations, including compromising criminal cases, based on his sexual affair with a co-defendant in a homicide case. In its order denying post-conviction relief, the post-conviction court took judicial notice of the following facts:

> Officer Kelly, a homicide officer, was indicted for official misconduct for having a sexual relationship with a key witness in a Shelby County homicide case. He entered a plea of guilty to this charge in 2021, receiving diversion, and after successful completion the case was dismissed and all public records of that conviction were expunged.

At the September 23, 2022 hearing date, the Petitioner testified that she consistently maintained her innocence, telling trial counsel that she did not commit the crime and that "a lot of paperwork was wrong[.]" She said she had only "bits and pieces" of the discovery paperwork at the time she entered her plea. She stated that trial counsel never provided her with a complete copy of discovery, and that she did not receive the additional discovery documents until "some time during the end, before [she] was sent to prison." The Petitioner testified that she pointed out to trial counsel the evidence in her favor, including the "dates on some of [her] paperwork[,]" inconsistencies in the investigation, and problems with the way that Sergeant Kelly had served the search warrant.

The Petitioner testified that she was never informed that Sergeant Kelly had a "shady history[.]" Had she known that he engaged in criminal activity, she would not have pled guilty. She also stated that she did not learn until "later on down the line" that witnesses in her case had made identical statements that were dated differently. Had she known of the identical witness statements that were inconsistently dated, she would not have pled guilty. The Petitioner agreed that one of the pairs of identical statements, made by her friend, Nakita Jackson, contained not only a different date but a different time. She stated that it was never explained how Ms. Jackson could have made one statement at 10:59 p.m. on September 3, 2016 and an identical statement at 10:50 p.m. on September 5, 2016. The Petitioner testified that the inconsistent dates on the identical statements led her to believe evidence tampering had occurred in her case. Had she been informed of Sergeant Kelly's history of misconduct and of the questionable nature of the evidence against her, she would not have pled guilty.

The Petitioner testified that she entered an *Alford* guilty plea at the recommendation of her mother, rather than trial counsel, who never mentioned the possibility of an *Alford* plea. She said she maintained her innocence throughout and that she asked several times for trial counsel to take her case to trial, but trial counsel "denied [her]" each time, telling her on one occasion that she would get life in prison if she went to trial. The Petitioner stated that she and her mother reported trial counsel "to her superior about these things."

On cross-examination, the Petitioner at first testified that trial counsel never provided her with any of the witness statements. She then said that she received the statements "later on down the line" "a little time before" she entered her guilty plea. She said, however, that she did not have time to go over the statements and was, therefore, unaware of the discrepancies in the dates. Later in her cross-examination testimony, she admitted she could have read the statements but said that she could not understand them without trial counsel to assist her, and that trial counsel rarely visited. She testified that the problem with the search warrant was that too little time elapsed between when the warrant was received and when it was executed, which raised her suspicions. However, she had no proof to present at the hearing to show that the warrant was unlawful, stating that her post-conviction counsel had not had the time to investigate the matter.

When asked if there was anything else about Sergeant Kelly's behavior that caused her concern, she responded that when she said she wanted to call her lawyer, Sergeant Kelly threatened to hit her in the mouth. She said that there were things in Sergeant Kelly's reports that were inaccurate, including his statement in a report that he told her it was okay for her to call her lawyer. She acknowledged that only one of the six witness statements of which she complained was taken by Sergeant Kelly but countered that Sergeant Kelly was in charge of "the whole investigation[.]"

The Petitioner acknowledged that she responded appropriately in the guilty plea colloquy to all the trial court's questions, affirming that she was entering her guilty plea knowingly, intelligently, and voluntarily. She further acknowledged that the trial court reviewed in detail what a best interest guilty plea entailed, explaining that there was no difference between it and a regular guilty plea other than that she was saying that she did not commit the crime and was pleading guilty because she believed it was in her best interest to do so. The Petitioner testified that her mother had learned about *Alford* guilty pleas from the Petitioner's brother, who had been incarcerated a couple of times. Finally, she acknowledged that when she entered the plea, she was nineteen, had obtained her GED, and was a freshman in college.

On redirect examination, the Petitioner testified that Sergeant Kelly was one of the main officers, if not the main officer, on her case. She said that she asked her trial counsel

to perform background checks on the witnesses but that trial counsel never provided any background on Sergeant Kelly.

The Petitioner's mother, Raniko Temple, testified that she provided a lot of information to trial counsel about the Petitioner's mental health background because trial counsel was concentrating on seeking plea deals instead of investigating. She said her son told her about the *Alford* plea, and that she asked trial counsel if the Petitioner could enter an *Alford* plea if the Petitioner decided to accept a plea deal.

On January 26, 2023, the post-conviction court entered a lengthy order denying the petition, finding that trial counsel was not deficient in her performance, that the Petitioner failed to show any prejudice resulting from trial counsel's alleged deficiencies, and that the Petitioner's guilty plea "was freely and voluntarily made, and knowingly and intelligently entered into, with an understanding of the nature and consequences of the plea[.]" Thereafter, the Petitioner filed a timely appeal to this court.

## ANALYSIS

The Petitioner argues on appeal that she was deprived of the effective assistance of counsel and her due process rights were violated because trial counsel did not review and discuss all the relevant facts with the Petitioner so that she could enter a knowing, intelligent and voluntary plea. The State argues that the post-conviction court properly denied the Petitioner relief on both claims because the Petitioner failed to meet either the deficiency or prejudice prong of her ineffective assistance of counsel claim, and the proof shows that she entered her guilty plea knowingly, intelligently, and voluntarily. We agree with the State.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *Id.* (first citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) and then citing *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). The issue of ineffective assistance of counsel, which presents

mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.* (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). In

the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by rules as stated in State v. Wilson*, 31 S.W.3d 189, 193 (Tenn. 2000). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. *Pettus*, 986 S.W.2d at 542. (citing *Mackey*, 553 S.W.2d at 340).

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against the defendant and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.* at 904-05.

In denying the petition, the post-conviction court found, among other things, that the Petitioner's allegations that the ballistics evidence and autopsy report were exculpatory was "totally unsupported by any proof and totally lacking in credibility." In contrast, the post-conviction court found trial counsel's evidentiary hearing testimony to be "extremely credible[.]" The post-conviction court noted that the statements of witnesses, including of the friend of who was with the Petitioner during the shooting, was that the Petitioner fired at the group of men without anyone having first fired at her. The post-conviction court further noted that the Petitioner had the witness statements, the ballistics report, and the autopsy findings prior to the entry of her guilty plea and that she assured the trial court that she was entering the plea knowingly, intelligently, and voluntarily. With respect to the allegations surrounding trial counsel's failure to investigate or inform the Petitioner of the

background of Sergeant Kelly, the post-conviction court found that the complaints contained in his personnel file were of "alleged beatings, sexual touchings, etc., in other cases[.]" The post-conviction court found that there was no proof at the evidentiary hearing that Sergeant Kelly did anything improper in the Petitioner's case, other than her allegation that he threatened to hit her. The post-conviction court also found that the Petitioner presented no proof that the search warrant was improperly obtained, that the results of the search would have been suppressed, or that Sergeant Kelly's involvement in the investigation "led to any false statements, illegalities or loss or improper gathering of evidence in the case." Finally, the post-conviction court found that the differently dated witness statements were identical except for the dates contained on the unsigned and signed versions, and "the change of the date of the statement when signed . . . had no effect on the contents of the witness statements, the investigation of the case or any effect on the petitioner's decision to plead guilty."

The record fully supports the findings and conclusions of the post-conviction court. The transcript of the guilty plea hearing demonstrates that the Petitioner assured the trial court that she was entering her plea knowingly, intelligently, and voluntarily and that she understood the consequences of the plea. In her evidentiary hearing testimony, the Petitioner acknowledged that she had possession of the witness statements prior to her entry of the plea and that she had obtained her GED and been admitted to college. She also indicated that she had some familiarity with the criminal justice system through her brother, who had been incarcerated and informed her mother of the possibility of an *Alford* plea. Trial counsel, a very experienced defense attorney, testified that she provided all discovery to the Petitioner, reviewed every page of discovery, and discussed in detail with the Petitioner the plea agreement and the pros and cons of accepting the twenty-year offer. Trial counsel also offered a reasonable explanation for not reviewing the personnel file of Sergeant Kelly, testifying that there was nothing to indicate that any officer involved in the case acted illegally or inappropriately. We, therefore, conclude that the post-conviction court properly denied the petition for post-conviction relief.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
JOHN W. CAMPBELL, SR., JUDGE